NOT DESIGNATED FOR PUBLICATION

No. 123,537

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MICHAEL ANDREW PAULSON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; PAUL J. HICKMAN, judge. Opinion filed June 17, 2022. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN and GARDNER, JJ.

PER CURIAM: Michael Andrew Paulson appeals the trial court's summary denial of his K.S.A. 60-1507 motion, alleging ineffective assistance of his trial and direct appeal counsel, Richard Ney. Paulson argues that contrary to the trial court's rulings, he was entitled to an evidentiary hearing on two issues: (1) Ney's failure to challenge the trial court's denial of his requested jury instruction on aggravated battery as a lesser included offense of his attempted first-degree murder charge in his direct appeal; and (2) Ney's failure to challenge his absence from his continued restitution hearing both before the trial court and in his direct appeal. Nevertheless, a review of Paulson's arguments under

1

the applicable law support the trial court's rulings. As a result, we affirm the trial court's summary denial of Paulson's K.S.A. 60-1507 motion.

FACTS

After killing Valerie Paulson, his wife, and nearly killing Jessie Putnam, his sister-in-law, on July 6, 2010, the State charged Paulson with first-degree murder and attempted first-degree murder, respectively. Eventually, Paulson's case proceeded to jury trial. As explained in Paulson's direct appeal to this court from his convictions for the intentional second-degree murder of Valerie and the attempted intentional second-degree murder of Putnam, which were lesser included offenses of the original crimes charged, the evidence at Paulson's trial unfolded as follows:

"Valerie and Paulson had been married for 20 years and had two sons, Austin and Nathan, who were 14 and 10 years old when their father killed their mother. Valerie had a daughter, Kyrsten, from an earlier marriage. Paulson had adopted Kyrsten, and she referred to him as her father. Valerie home-schooled the children and did not have outside employment. Paulson worked as a field representative for a private company, a job requiring him to travel frequently.

". . . [I]n 2007 or 2008, Valerie had an affair with a man who had worked with Paulson. She accumulated roughly $50,000 in credit card debt during that time. The couple separated briefly then, sought marriage counseling, and reconciled. Paulson took control of the family finances. They sold their home in Lindsborg and purchased a smaller, less expensive house in a nearby community. The marital friction continued.

"Paulson suspected Valerie was having another affair. The State's theory of the case had Paulson, armed with a knife, going to the family home to kill Valerie when she returned—a premeditated murder. The prosecutor suggested Paulson's motive lay, at least in part, in the family's deep-seated, conservative religious views in which divorce was anathema. Paulson's explanation at trial had him returning to the family home and hiding upstairs to discover information Valerie might reveal either confirming or refuting his suspicion about the new affair. Paulson did not testify. For the most part, the jurors heard his version of the attack through his out-of-court conversations with the psychologist who

2

testified at trial as a key part of the defense case. According to that account, Paulson overheard a conversation between Valerie and Putman and a cell phone call between Valerie and her putative lover that in his mind confirmed the affair. But he never described the details of the conversation or of the phone call. Paulson said upon confirming the affair, he lost control, stormed down the stairs, apparently picked up a knife in the kitchen, and attacked Valerie and Putman. As the psychologist recounted Paulson's version, everything appeared to him in 'flashes' and he did not have a recollection of stabbing either Valerie or Putman.

"Putman testified that she and Valerie arrived at the house in the early evening. Valerie immediately noticed that in some of the family photographs Paulson had pasted pictures of her ex-husband or the man with whom she had earlier had an affair over his own face. Putman looked around to see if Paulson was there but didn't find him. Putman said she and Valerie began straightening up the house and cleaning the kitchen. According to Putman, Valerie spoke briefly about the man with whom Paulson suspected she was then involved. But Putman said the conversation did not relate to the nature of the relationship. Valerie told her the man was going to pay for her divorce. Putman told the jurors she stepped away and did not hear what Valerie said to the man during the cell phone call.

"Putman testified she went out the back door to make a call on her cell phone. As she looked back inside, she saw Paulson run from the dining room, through the kitchen, and toward the back bedroom. Putman testified she did not see Paulson pick up anything as he ran toward the bedroom. She then heard Valerie screaming, 'Stop, no, Andy, oh [G]od, no, stop.' Putman testified she immediately tried to call 911, but the call didn't go through. So she went back inside, encountering Paulson in the kitchen. Paulson immediately stabbed Putman in the abdomen. Putman fled into the backyard. Paulson followed. He continued to stab her in the chest until the two fell into the yard. He then stabbed her in the back. But, as they struggled, Paulson stopped the attack and went back into the house. Putman then succeeded in calling 911 on her phone. As she pleaded for help, Paulson returned, grabbed her cell phone, and began stabbing her again. Putman asked him why he attacked her, and Paulson replied: '[Y]ou're the reason we're getting divorced, you're the reason she is leaving me.' She told Paulson that she had never done anything to him. At that point, Paulson stopped and went into the house again. Putman made it to her car and drove away. Putman testified she was struggling to breathe and remain conscious, so she pulled into the parking lot of a building supply store and cried

3

out for help. As store employees called for an ambulance, Putman told an off-duty law enforcement officer at the store that Paulson had stabbed her. Putman was hospitalized for multiple stab wounds to her arms and torso.

"When law enforcement officers arrived at the home, Paulson had already fled. They found Valerie's body in the bathtub of the downstairs bathroom. A forensic pathologist later identified 18 stab wounds, including 6 to Valerie's chest, 7 to the right side of her torso, and defensive injuries to hands and arms.

"After driving away from the home, Paulson called Kyrsten. She described him as crying very hard and sounding 'out of it.' He told Kyrsten he had killed Valerie and intended to visit his parents to say goodbye to them. Paulson then asked to speak to Austin and Nathan and told Austin that Valerie and Putnam were dead. As Paulson talked to his sons, Kyrsten called 911 and then tried to reach the family's minister.

"The morning after the attack, Paulson was arrested at a café in Bennington, a little town just over 25 miles away. An officer who participated in the arrest testified that Paulson said his wife was having an affair and was going to take his children. But Paulson did not otherwise say anything about the attack on Valerie and Putman. The officer described Paulson as calm and cooperative." *State v. Paulson*, No. 108,795, 2015 WL 6444314, at *2-3 (Kan. App. 2015) (unpublished opinion).

For his crimes, the trial court sentenced Paulson to a controlling term of 226 months' imprisonment followed by 36 months' postrelease supervision. Because Paulson disputed how much he owed in restitution and court costs, the trial court bifurcated Paulson's restitution hearing from his sentencing hearing. When scheduling Paulson's continued restitution hearing, Ney asked the trial court whether it "inten[ded] to hold Mr. Paulson" in the local jail pending the continued restitution hearing. The trial court told Ney that this was not its intention. Ney responded, "All right. Then it really does not matter."

At the outset of the continued restitution hearing, the trial court noted Paulson's absence. At this point, the prosecutor explained that Paulson "had indicated at the sentencing hearing that he did not wish to be here." And she asked Ney whether this was correct. Ney responded, "That's right."

4

Afterwards, the State had Patricia Scalia, who was the Board of Indigents' Defense Services' (BIDS) Director, testify about how much BIDS spent to represent Paulson. It is undisputed that Paulson always had enough money to afford private counsel. Still, for a time, Paulson had BIDS appointed counsel because in Putnam's civil suit against Paulson, a different trial court froze his assets. In time, some of Paulson's assets were unfrozen, at which point, he retained private counsel. Yet, the State argued that because Paulson could always afford private counsel, Paulson needed to repay BIDS for its counsel's representation. To support this argument, Scalia testified that BIDS spent $8,236.16 to represent Paulson. Additionally, the State argued that Paulson owed $18,091.25 to the Kansas Crime Victims Fund (Fund) and $9,692.10 in court costs. The restitution Paulson owed to the Fund was repayment for the money given to Putnam so she could afford her medical expenses and offset her wage losses. The State's requested court costs involved discovery expenses and expenses related to Paulson's mental disease or defect defense.

Ney objected, arguing that Paulson owed BIDS nothing because he would have immediately retained private counsel but for his assets being frozen by the trial court in Putnam's civil case. Ney argued that Paulson owed the Fund nothing because Paulson's civil settlement with Putnam fully compensated Putnam for her injuries from his criminal conduct. Ney further argued that the State had inflated the court costs involving Paulson's discovery expenses and involving Paulson's mental disease or defect defense. Ultimately, the trial court ordered Paulson to pay $8,236.16 to BIDS and $18,091.25 to the Fund as requested by the State. Also, although the State argued that Paulson should pay $9,692.10 in court costs, the trial court ordered Paulson to pay $8,990.60 in court costs. It concluded that Paulson owed less in court costs because the State was overcharging Paulson for making discovery copies.

In his direct appeal, in addition to cumulative error, Paulson argued that six trial errors required the reversal of his intentional second-degree murder and attempted intentional second-degree murder convictions. Paulson's main argument was that the trial

5

court committed reversible error when it refused to instruct the jury on voluntary manslaughter and attempted voluntary manslaughter as lesser included offenses. Paulson's second argument was that the prosecutor committed reversible misconduct during closing arguments. Paulson also challenged the trial court's order requiring him to repay BIDS and to pay restitution in a couple of ways. As he did before the trial court, he contended that he owed the Fund nothing because his civil settlement with Putnam fully compensated her for her injuries from his criminal conduct. Paulson further complained that the trial court wrongly ordered him to pay restitution without adequately considering his ability to pay as required under K.S.A. 22-4513(b).

Although this court determined that the prosecutor made an improper comment during closing arguments, it determined that the prosecutor's error was not reversible error. 2015 WL 6444314, at *12-13. As for Paulson's remaining trial error complaints, this court concluded that those complaints were baseless. 2015 WL 6444314, at *12-29. Then, this court determined that the trial court adequately considered Paulson's ability to pay restitution as required under K.S.A. 22-4513(b). 2015 WL 6444314, at *26. Likewise, it determined that Paulson "had not advanced a sound reason for extinguishing the Fund's legal right to restitution in this case." 2015 WL 6444314, at *29. So, in his direct appeal, this court affirmed Paulson's convictions, sentence, BIDS repayment obligation, restitution obligation, and costs obligation.

Once this court affirmed Paulson's convictions, Paulson moved for relief under K.S.A. 60-1507. In his pro se K.S.A. 60-1507 motion, Paulson made several broad claims of ineffective assistance of counsel. This included arguing that Ney provided ineffective assistance of appellate counsel by not challenging the trial court's denial of his requested jury instruction on aggravated battery as a lesser included offense of his attempted intentional first-degree murder charge. In making this argument, Paulson recognized that under our Supreme Court's precedent in *State v. Gaither*, 283 Kan. 671, Syl. ¶ 12, 156 P.3d 602 (2007), the trial court correctly denied Ney's request to instruct the jury on

aggravated battery as a lesser included offense of his attempted first-degree murder charge. Even so, Paulson argued that following his jury trial, our Supreme Court reversed *Gaither*'s precedent in *State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Thus, Paulson seemingly argued that *Dunn*—a case he never provided a pinpoint citation to—constituted a change in law occurring after his jury trial that Ney should have addressed in his direct appeal. In his pro se motion, Paulson also argued that Ney was ineffective for not ensuring his presence at his continued restitution hearing as well as by not addressing his absence during his restitution hearing in his direct appeal. He suggested that had he been present at his continued restitution hearing, the trial court may not have ordered him to pay restitution to the Fund after hearing his testimony about his civil settlement with Putnam.

After appointing counsel to represent Paulson and holding a preliminary hearing on Paulson's K.S.A. 60-1507 motion so he could clarify his broad ineffective assistance of counsel claims, the State asked the trial court to summarily deny Paulson's motion. It asserted that contrary to Paulson's argument, our Supreme Court had not reversed its precedent in *Gaither* holding that aggravated battery is not a lesser included crime of attempted first-degree murder. For this reason, it argued that Ney could not be ineffective for failing to challenge *Gaither*'s precedent in Paulson's direct appeal. Regarding Paulson's absence from his restitution hearing, the State stressed that in *State v. Hall*, 298 Kan. 978, 987, 319 P.3d 506 (2014), our Supreme Court held that a defendant may waive his or her right to be present at a bifurcated restitution hearing. Then, citing Ney's comments to the trial court at Paulson's sentencing hearing and continued restitution hearing, the State argued that Paulson had waived his right to be present at his continued restitution hearing. So, the State argued that Ney was not ineffective for failing to challenge Paulson's absence from his continued restitution hearing because Paulson waived his right to be present at that hearing. Alternatively, the State argued that Paulson failed to prove how he was prejudiced by his inability to attend his continued restitution hearing.

In the end, the trial court summarily denied Paulson's K.S.A. 60-1507 motion. It determined that Paulson's argument about Ney not challenging the trial court's denial of his requested jury instruction on aggravated battery as a lesser included offense of attempted first-degree murder was unpersuasive because he had not cited any authority proving that our Supreme Court reversed its precedent in *Gaither*. Although the trial court speculated that Paulson's references to *State v. Dunn* meant our Supreme Court's *Dunn*, 304 Kan. 773, decision, it stressed that Paulson in no way explained how this case applied to him or reversed *Gaither*'s precedent. As for Paulson's absence from his restitution hearing, the trial court found that Ney's comments to it at Paulson's sentencing hearing and continued restitution hearing proved that Paulson had voluntarily waived his right to be present at his continued restitution hearing. It also ruled that our Supreme Court's precedent in *State v. Sandstrom*, 225 Kan. 717, 720, 595 P.2d 324, 327 (1979), and *Hall*, 298 Kan. at 986, supported its decision.

Paulson timely appeals the summary denial of his K.S.A. 60-1507 motion.

ANALYSIS

*Did the trial court err by summarily denying Paulson's K.S.A. 60-1507 motion?*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right, which is made applicable to the states through the Fourteenth Amendment, also guarantees the criminal defendant a right to effective assistance of counsel. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). To establish that counsel's performance denied him or her fair process, a defendant must prove (1) that counsel's performance was deficient under the totality of the circumstances and (2) that counsel's performance resulted in prejudice. 300 Kan. at 882. This means that the defendant must establish that the complained about result—that his or her conviction or the denial of his

8

or her direct appeal—would not have occurred but for counsel's deficient performance. 300 Kan. at 882-83; see *Miller v. State*, 298 Kan. 921, 930-31, 934, 318 P.3d 155 (2014). When engaging in this review, there is a strong presumption that counsel's representation of the defendant fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). And counsel's well-researched strategic decisions are virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013).

Under K.S.A. 2021 Supp. 60-1507(a), a prisoner may move for relief if his or her

"sentence was imposed in violation of the constitution or laws of the United States, or the constitution or laws of the state of Kansas, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."

Yet, to avoid summary dismissal of his or her motion, the K.S.A. 60-1507 movant must make more than conclusory contentions. This means that the movant must provide evidentiary support for his or her claims. *Sola-Morales*, 300 Kan. at 881. When the trial court summarily denies a K.S.A. 60-1507 motion based on the motions, files, and records of the case, this court exercises unlimited review over the trial court's decision. 300 Kan. at 881.

On appeal, Paulson challenges the trial court's summary denial of his K.S.A. 60-1507 motion in two ways. First, he argues that the trial court erred by summarily denying his claim that Ney provided ineffective assistance of appellate counsel by not addressing the trial court's denial of his requested jury instruction on aggregated battery as a lesser included offense of his attempted first-degree murder of Putnam charge. Second, he argues that the trial court erred by summarily denying his claim that Ney provided both

9

ineffective assistance of trial counsel and appellate counsel by not addressing his absence at his continued restitution hearing.

a. *Aggravated Battery Jury Instruction*

Paulson's claim about Ney's failure to address the trial court's denial of his requested jury instruction on aggravated battery as a lesser included offense of his attempted first-degree murder charge is slightly different than the claim he raised before the trial court. Before the trial court, Paulson's complaint involved Ney being ineffective on appeal for failing to challenge the trial court's denial of his requested jury instruction on aggravated battery as a lesser included offense of attempted first-degree murder based on *Dunn*'s change of law overruling *Gaither*'s precedent. Now, Paulson recognizes that *Gaither* remains good law. Nonetheless, he argues that *Gaither* "was wrongly decided and runs counter to the prevailing trend in the country."

The *Gaither* court explicitly held that "aggravated battery does not qualify as a lesser-included crime of attempted first-degree murder." 283 Kan. at 692. But Paulson argues that the *Gaither* court erred in reaching this holding because it determined that aggravated battery was not a lesser included offense of attempted first-degree murder by comparing the elements of aggravated battery to a completed first-degree murder. He asserts that such analysis was erroneous because the harm resulting from an aggravated battery is not the same as the harm resulting from a completed first-degree murder. He also points out that courts in South Carolina and Florida have held that aggravated battery is a lesser included offense of attempted first-degree murder under their relevant statutes. See *State v. Middleton*, 407 S.C. 312, 319, 755 S.E.2d 432 (2014); *Damico v. State*, 946 So. 2d 589, 591 (Fla. Dist. Ct. App. 2006). Given this, Paulson concludes that if Ney had challenged the trial court's denial of his requested aggravated battery instruction on appeal, this court would have reversed *Gaither*'s precedent, reversed his attempted

10

intential second-degree murder conviction, and remanded his case for a new trial on that charge.

The State counters that Paulson's argument ignores the *Gaither* court's reasoning for comparing an aggravated battery to a completed first-degree murder rather than an attempted first-degree murder. It counters that Paulson's argument ignores that in his direct appeal, this court could not simply ignore our Kansas Supreme Court precedent in *Gaither*. It stresses that under the assumption that Paulson was referring to our Supreme Court's 2016 *Dunn* decision, Paulson failed to explain how the *Dunn* decision overruled *Gaither*'s precedent. Additionally, the State stresses that assuming Paulson was referring to our Supreme Court's 2016 *Dunn* decision, that decision (1) did not apply to Paulson because it was issued after our Supreme Court denied his petition for review and (2) did not overturn *Gaither*'s holding that aggravated battery was not a lesser included offense of attempted first-degree murder. Thus, the State argues that we should affirm the trial court's summary denial of Paulson's K.S.A. 60-1507 motion because Paulson has not established that Ney should have raised the disputed lesser included offense issue in his direct appeal.

There are several problems with Paulson's argument, including the problems advanced by the State. For starters, as just noted, Paulson's current appellate argument is not the same argument that he raised before the trial court. Paulson's argument before the trial court hinged on Ney's failure to challenge the trial court's denial of his requested jury instruction on aggravated battery as a lesser included offense of attempted first-degree murder based on *Dunn*'s change in law invalidating *Gaither*'s precedent. Although the State addresses Paulson's arguments about the *Dunn* decision in its appellee's brief, it never recognizes that this claim is different from Paulson's current ineffective assistance of counsel claim about Ney failing to challenge the correctness of *Gaither*'s precedent because the prevailing trend in the country is changing. In any case, Paulson is raising his particular claim of ineffective assistance of counsel for the first time on appeal.

11

"As a general rule, an appellate court will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). Also, when an appellant raises an argument for the first time on appeal, that appellant must explain why the argument was not raised below as well as why the newly raised argument should be considered for the first time on appeal. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). If the appellant fails to do this, he or she violates Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 35). And our Supreme Court has held that an appellant who violates Rule 6.02(a)(5) has improperly briefed his or her newly raised argument, resulting in abandonment of his or her newly raised argument. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Here, because Paulson has raised his specific claim of ineffective assistance of counsel for the first time on appeal without addressing his failure to raise his claim before the trial court, he has improperly briefed his argument in violation of Rule 6.02(a)(5). Thus, we hold that Paulson has abandoned his argument that Ney provided ineffective assistance of counsel by not challenging the validity of *Gaither*'s precedent in Paulson's direct appeal.

Next, even if we disregarded this preservation problem, the State's counterarguments further undermine Paulson's arguments. Concerning his argument before the trial court that Ney was ineffective for not addressing *Dunn*'s so-called change in law in his direct appeal, Paulson's argument ignores this court's rules of procedure. This court affirmed Paulson's conviction in his direct appeal in October 2015. Then, our Supreme Court denied Paulson's petition for review from his direct appeal in April 2016. A couple months after this, our Supreme Court issued the *Dunn* decision in July 2016. But a defendant may only claim the benefit of changes in law that happen while his or her case is pending on direct appeal. *State v. Broxton*, 311 Kan. 357, Syl. ¶ 3, 461 P.3d 54 (2020). So, even if we assumed for the sake of argument that the *Dunn* decision somehow overruled *Gaither*'s holding that aggravated battery is not a lesser included offense of attempted first-degree murder, our Supreme Court denied Paulson's petition for review from his direct appeal well before it issued the *Dunn* decision. Under those

12

circumstances, Ney could not have been ineffective for failing to address *Dunn* in Paulson's direct appeal; counsel cannot provide deficient performance for failing to cite caselaw that does not yet exist. Thus, in summarily denying Paulson's K.S.A. 60-1507 motion, the trial court correctly rejected this argument.

As for Paulson's current appellate argument, Paulson's argument that the *Gaither* court used internally inconsistent analysis to hold that aggravated battery was not a lesser included offense of attempted first-degree murder never addresses our Supreme Court's actual reasoning for this holding. In *Gaither*, our Supreme Court gave the following explanation (1) why aggravated battery was not a lesser included offense of attempted first-degree murder and (2) why the attempt element was irrelevant in its analysis:

> "A basic examination of the statutory definitions for first-degree murder and aggravated battery reveal a distinction between the two. First-degree murder involves killing and aggravated battery involves bodily harm. See K.S.A. 21-3401; K.S.A. 21-3414. Each crime is defined by the harm caused rather than the act performed. Because of this distinction, first-degree murder and aggravated battery are not the same crime. The definition for attempt relies on the definition of the underlying but uncompleted crime and requires a specific intent to commit the underlying crime. K.S.A. 2006 Supp. 21-3301. The attempt statute, however, does not alter the basic definition for the underlying crime. Thus, attempted first-degree murder is not converted into the same crime as aggravated battery merely by adding the attempt elements to the first-degree murder elements. Accordingly, aggravated battery does not qualify as a lesser-included crime of attempted first-degree murder under K.S.A. 2006 Supp. 21-3107(2)(a)." 283 Kan. at 692.

But in his brief, Paulson never addresses the *Gaither* court's specific reasoning about an attempt element not converting the *intended* harm of an attempted first-degree murder into the same *intended* harm as an aggravated battery. Instead, he complains that its analysis is internally inconsistent because the crimes of aggravated battery and attempted first-degree murder both result in the same harm—a living but battered victim. Also, although Paulson points to caselaw from other jurisdictions as proof that

13

aggravated battery is a lesser included offense of attempted first-degree murder, Paulson never cites any Kansas authority indicating that our Supreme Court is moving away from its holding in *Gaither* that aggravated battery is not a lesser included offense of attempted first-degree murder. And within the past year, this court has rejected an argument that counsel was ineffective for failing to request aggravated battery as a lesser included offense of attempted first-degree murder based on *Gaither*'s precedent. *Davis v. State*, No. 121,858, 2021 WL 1825684, at *12 (Kan. App. 2021) (unpublished opinion).

It is a well-known rule that absent some indication that our Supreme Court is departing from a previous precedent, we are duty-bound to follow all rulings of our Supreme Court. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Here, by failing to address the *Gaither* court's actual analysis or authority directly undermining that analysis, Paulson's argument has not adequately grounded his minor premise. For example, he has not proven that our Supreme Court is moving away from its precedent in *Gaither*. See *Salary*, 309 Kan. at 481 (holding that failure to support a point with pertinent authority in the face of contrary authority is akin to failing to brief the issue). As a result, we affirm the trial court's summary denial of Paulson's argument that Ney was ineffective. To summarize, in addition to Paulson's failure to preserve this argument for appeal, he has completely failed to establish that our Supreme Court is departing from its *Gaither* precedent that aggravated battery is not a lesser included offense of attempted first-degree murder. So these shortcomings are fatal to his reasoning and claim.

   b. *Restitution, Court Costs, and BIDS Fees*

As addressed earlier under the facts section, Ney indicated at the end of Paulson's sentencing hearing that Paulson did not want to attend his continued restitution hearing. Then he asked the trial court whether it was the court's intent to hold Paulson at the local jail until the continued restitution hearing. When the trial court told Ney that it did not intend to hold Paulson at the local jail until his continued restitution hearing, Ney

14

responded, "All right. Then it really does not matter." Then, at Paulson's continued restitution hearing, after the prosecutor told the trial court that Paulson was not present because "he did not wish to be here," Ney affirmed the prosecutor's statement.

Despite the preceding, Paulson argues that Ney was ineffective for failing to ensure his presence at his continued restitution hearing and for failing to address his absence from his continued restitution hearing in his direct appeal. Paulson contends that Ney's comments to the trial court were not a valid waiver of his right to be present at his continued restitution hearing. Although not entirely clear, Paulson seemingly takes issue with the trial court's reliance on *Sandstrom*, 225 Kan. at 720, when rejecting his argument because *Sandstrom* is older precedent. Additionally, he contends that because he was not present at a critical stage of his criminal proceedings, his absence from his continued restitution hearing was akin to structural error. The State counters that the trial court's summary denial of this issue was proper by comparing Paulson's case to the *Sandstorm* decision.

The *Sandstrom* decision did not involve a restitution or court costs issue. All the same, in *Sandstrom*, our Supreme Court rejected Sandstrom's argument that her right to be present under K.S.A. 22-3405 had been violated when she was not present at two posttrial hearings. At those hearings, Sandstrom's counsel had told the trial court that Sandstrom did not want to be present. Because of this, our Supreme Court had "no hesitancy in holding that the defendant did voluntarily waive her right to be present at the two hearings in question." 225 Kan. at 721.

Since deciding *Sandstrom*, our Supreme Court has held that "because restitution constitutes a part of a defendant's sentence, its amount can only be set by a sentencing judge with the defendant present in open court." *Hall*, 298 Kan. at 986. This means that a defendant's sentencing is not complete until the court has decided restitution. Still, "a defendant may waive his or her right to be present at the continued sentencing hearing."

15

298 Kan. at 988. And although our Supreme Court has advised courts to have a defendant's waiver appear "on the record," our Supreme Court has upheld implicit restitution hearing waivers. 298 Kan. at 988. For instance, in *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014), our Supreme Court held that Frierson implicitly waived his right to be present at his later restitution hearing (1) by agreeing in open court at his sentencing that the trial court could extend jurisdiction on the issue of restitution and (2) by his attorney signing the ultimate restitution order. 298 Kan. 1005, Syl. ¶¶ 9-10. Meanwhile, in *State v. McLinn*, No. 104,882, 2014 WL 3843071, at *4 (Kan. App. 2014) (unpublished opinion), relying on *Frierson*'s precedent, this court affirmed the trial court's restitution order entered against McLinn. The *McLinn* court emphasized that McLinn had "impliedly waived his right to be present at a restitution hearing by accepting that he owed restitution and accepting the amount owed" (1) because McLinn's attorney signed the order setting the amount of restitution that McLinn had to pay and (2) because the trial court granted the restitution continuance in open court while McLinn was present. 2014 WL 3843071, at *4.

Although Paulson complains about the trial court's reliance on *Sandstrom* to hold that he waived his right to be present at his continued restitution hearing, the trial court's reliance on *Sandstrom* was limited and appropriate. When the trial court cited *Sandstrom*, it did so to point out that our Supreme Court had previously accepted an attorney's on-the-record statements about a client's absence over the belated contradictory assertion of that now former client. Said another way, it cited *Sandstrom* as authority why it was accepting the truth of Ney's on-the-record statements about Paulson not wanting to be present at his continued restitution hearing over Paulson's belated K.S.A. 60-1507 complaint about not being present at his continued restitution hearing.

In any case, Paulson's case is comparable to the *McLinn* decision. Like *McLinn*, Paulson was present when Ney asked whether the trial court intended to hold him for the continued restitution hearing. Paulson said nothing when Ney suggested that he did not

want to remain at the local jail so he could attend his continued restitution hearing. Also, like *McLinn*, once the continued restitution hearing happened, Ney signed the restitution journal entry, taking no issue with it. So, the *McLinn* decision supports that Paulson implicitly waived his right to be at his continued restitution hearing.

On top of this, Paulson's implicit waiver is stronger than *McLinn*'s implicit waiver. *McLinn* involved a defendant complaining about his restitution hearing absence on direct appeal. *But Paulson waited until moving for relief under K.S.A. 60-1507 to argue that Ney's comments to the trial court at the end of his sentencing hearing were not a waiver of his right to be present at his continued restitution hearing. And Ney raised restitution and costs issues for Paulson on direct appeal.* Again, Ney argued that the trial court gave Putnam double recovery by making Paulson pay restitution to the Fund outside his civil settlement with Putnam and that the trial court otherwise failed to adequately consider Paulson's financial ability to pay restitution. Put simply, the fact Ney made restitution arguments on Paulson's behalf without mentioning his absence constitutes further proof that Paulson voluntarily waived his right to attend his continued restitution hearing. If Paulson had not voluntarily waived his right to attend his continued restitution hearing, one would assume that Ney would have addressed his absence while arguing that trial court failed to adequately consider Paulson's ability to repay restitution.

Most importantly, in making his argument, Paulson never challenges Ney's comments at the end of his sentencing hearing and start of his continued restitution hearing indicating that he did not want to attend his continued restitution hearing. *So, Paulson never asserts that Ney lied or misrepresented his wishes not to attend his continued restitution hearing. Rather, his complaint is that the record does not contain his express waiver of his right to be at his continued restitution hearing.* Nevertheless, as explained in the preceding analysis, our Supreme Court has held that a defendant may implicitly waive his or her right to be present at a continued restitution hearing. Here, Paulson's implicit waiver is both comparable and stronger than the implicit waiver that

this court upheld in *McLinn*. As a result, Paulson has not presented a persuasive argument why he did not implicitly waive his right to be present at his continued restitution hearing through Ney's comments. Thus, we reject this argument.

Affirmed.